IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LATISA THORNTON, as | ) | |
| ADMINISTRATRIX of the Estate of | ) | |
| MILDRED RILEY, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:16-cv-829-MHT-DAB |
| | ) | |
| JOHN W. MITCHELL, M.D., and THE | ) | |
| HEART CENTER CARDIOLOGY, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

In this medical malpractice wrongful death case brought pursuant to the Alabama Medical Liability Act and applicable federal law, Plaintiff Latisa Thornton, as Administratrix of the Estate of Mildred Riley, sues Defendants, John W. Mitchell, M.D. and The Heart Center Cardiology, P.C., for medical negligence that resulted in the death of Mildred Riley.  (Doc. 44).  Before the court are Plaintiff's motions challenging the admissibility of the defense medical experts: Plaintiff's Motion to Exclude Opinion Testimony of Arthur Scott Westermeyer, M.D. (Doc. 80); Plaintiff's Motion to Exclude Testimony and Opinions of Kevin Sublett, M.D. (Doc. 81); Plaintiff's Motion to Exclude Testimony and Opinions of Alain Bouchard, M.D. (Doc. 82); and Plaintiff's Motion to Exclude Testimony and Opinions of Oscar Julian Booker, M.D. (Doc. 83).  The Defendants filed responses in opposition (Docs. 84–87), and the Plaintiff filed replies (Docs. 89–91).  Also before the court are Defendants' Motion to Preclude Plaintiffs' Experts and Motion for Summary Judgment (Doc. 79), Plaintiff's response in opposition (Doc. 88), Defendants' reply (Doc. 93), and Defendants' Motion to Strike and Preclude Plaintiff's Use of Medical Literature (Doc. 92) to which Plaintiff responded (Doc. 94) and Defendants replied (Doc. 96).  The parties had an opportunity to fully brief the matters, and the court heard argument on May 23, 2018.

For the reasons that follow, it is recommended that Plaintiff's Motion to Exclude Opinion Testimony of Arthur Scott Westermeyer, M.D. (Doc. 80) be **granted in part** and **denied in part**; Plaintiff's Motion to Exclude Testimony and Opinions of Kevin Sublett, M.D. (Doc. 81) be **denied as moot** because he was withdrawn by Defendants; Plaintiff's Motion to Exclude Testimony and Opinions of Alain Bouchard, M.D. (Doc. 82) be **denied**; Plaintiff's Motion to Exclude Testimony and Opinions of Oscar Julian Booker, M.D. (Doc. 83) be **denied**;  Defendants' Motion to Preclude Plaintiffs' Experts and Motion for Summary Judgment (Doc. 79) be **granted**.  Given this recommendation, it is further recommended that Defendants' Motion to Strike and Preclude Plaintiff's Use of Medical Literature in Response to Defendants' Motion to Preclude and Motion for Summary Judgment (Doc. 92) be **denied as moot**.

## I.     JURISDICTION

This court has diversity of citizenship subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as to Plaintiff's cause of action.  The parties do not contest personal jurisdiction or venue, and the court finds sufficient information of record to support both.  *See* 28 U.S.C. § 1391.  On January 5, 2017, the above-styled matter was referred to the undersigned for recommendation on all pretrial matters by United States District Judge Myron H. Thompson. (Doc. 22); *see also* 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State Bd. of Educ. of State of Ga.,* 896 F.2d 507 (11th Cir. 1990).

## II.    LEGAL STANDARDS

### A.     *Daubert Motions*

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,  509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999), the Supreme Court directed trial courts to perform a "gatekeeper" function, designed to ensure that expert testimony is both relevant and reliable. As explained by the Eleventh Circuit:

> In *Daubert*, the Supreme Court explained that trial courts must act as "gatekeepers" tasked with screening out "speculative, unreliable expert testimony." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 597, 113 S. Ct. 2786). In that role, trial courts may consider a non-exhaustive list of factors including (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community. *Id.* Later, in *Kumho*, the Court explained that the gatekeeping function governs all expert testimony based on "scientific, technical, or other specialized knowledge," not just scientific testimony. 526 U.S. at 147–49, 119 S. Ct. 1167 (quoting Fed. R. Evid. 702). The Court also stressed that the factors identified in *Daubert* "do not constitute a definitive checklist or test." *Id.* at 150, 119 S. Ct. 1167 (internal quotation marks omitted). While those factors may help in assessing the reliability of scientific or experience-based expert testimony, the district court's "gatekeeping inquiry must be tied to the facts of a particular case." *Id.* (internal quotation marks omitted). Furthermore, *Kumho* emphasized that the goal of gatekeeping is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S. Ct. 1167.

*Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1327 (11th Cir. 2014).  This gatekeeping responsibility entails a three-part inquiry in which the court considers whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of specialized expertise, to understand the evidence or to determine a fact in issue.  *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir. 2003).  "The burden of laying a proper foundation for the admissibility of an expert's testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins.*

3

*Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004) (quoting *Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1306 (11th Cir. 1999)).

      B.   *Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## III.   BACKGROUND AND FACTS

The facts are taken, as they must for summary judgment purposes, in a light most favorable to the Plaintiff.[1]  This is a medical malpractice case initiated by Lisa Thornton as Administratrix of the Estate of her mother, Mildred Riley, following the death of Mrs. Riley who had been a patient of Defendants, Dr. Mitchell and The Heart Center, since 2008.  Mrs. Riley's known medical history included coronary artery disease, high cholesterol, hypertension, peripheral arterial disease, sleep disorder, and thyroid disease.  (Doc. 79-1 at 35).  Additionally, she was a patient with many known risk factors for coronary artery disease such as atherogenic diet,  sedentary lifestyle, female gender and age greater than 55 (age 71), a family history of heart disease, a prior history of myocardial infarction, and documented atherosclerotic cardiovascular disease.

She had a history of recurrent ischemic heart disease requiring multiple prior cardiac interventions. In July 2007, Mrs. Riley underwent a percutaneous intervention at West Georgia Medical Center.  In April 2008, Mrs. Riley presented to Defendants with complaints of anterior chest tightness and a stress test was ordered to evaluate for progression of her ischemic heart disease.  The stress test was positive/abnormal (demonstrated a wall motion abnormality raising the question of underlying ischemic disease), and a subsequent catheterization was performed four days later revealing severe disease/blockage in multiple coronary arteries.  These areas of blockage were reduced with percutaneous transluminal angioplasty the following day.  In December 2009, Mrs. Riley was seen in Dr. Mitchell's office and as a result of this visit, a stress test was ordered, interpreted as positive/abnormal and Mrs. Riley underwent a left heart catheterization seven days later, which revealed severe blockages in multiple coronary arteries.  As a result, Mrs. Riley underwent open heart surgery and coronary artery bypass grafting.  In March 2011, Mrs. Riley presented to Defendants with complaints of "some further chest discomfort." A stress test was ordered, interpreted by Dr. Mitchell as positive/abnormal and, as a result, a right/left heart catheterization was scheduled and performed twelve days later, which revealed that her

---

[1] Unless indicated otherwise, the facts are taken from Plaintiff's statement of the case in her response in opposition to the Defendants' motion for summary judgment.  (Doc. 88).

right coronary graft was occluded and the un-bypassed portion of the circumflex had a severe proximal lesion. *See* (Doc. 88 at 12–13).

In August 2012 she was seen by Dr. Mitchell in follow up after a visit to the emergency room over the weekend with complaints of chest pain. (Doc. 79-1 at 40). A myocardial infarction was ruled out, and her stress test was interpreted as fine. *Id.* She returned in August 2013 with complaints of occasional chest pain when she's stressed out. *Id.* at 39. Dr. Mitchell ordered a stress echocardiogram to follow up on her coronary disease and she was to return in one year or earlier as needed. *Id.* She was seen by her regular primary care physician, Gary R. Solt, M.D., on November 5, 2013, for prescription refills. She denied any problems at that time. Her August 2013 cardiac check-up with Dr. Mitchell was noted. (Doc. 79-7 at 8).

On October 30, 2014, Mrs. Riley returned to see Dr. Mitchell with complaints of chest pain and chest tightness, which tended to occur more often at night. (Doc. 79-1 at 36). She reported fatigue and severe dyspnea with exertion. *Id.* The stress test performed the year prior (in August 2013) was negative. *Id.* Dr. Mitchell ordered a stress echocardiogram to evaluate the status of her coronary disease, "particularly given her symptoms." *Id.* Dr. Mitchell's assessment was angina, coronary atherosclerosis, coronary bypass graft finding, essential hypertension, hyperlipidemia, obstructive sleep apnea syndrome, and obesity. *Id.* at 37. As ordered by Dr. Mitchell, Mrs. Riley's stress echocardiogram was performed on November 4, 2014, and revealed positive ST segment changes with infusion and Mrs. Riley was noted to have typical angina during the test. *Id.* at 78–81. Dr. Mitchell interpreted the stress test as being positive/abnormal with a dobutamine induced wall motion abnormality suggesting underlying ischemic disease. *Id.* at 81.

As a result of the abnormal stress test, Dr. Mitchell recommended a left heart catheterization with possible percutaneous intervention ("PCI"). With respect to the timing of the scheduling of the catheterization, Tim Parker, Dr. Mitchell's medical assistant, has explained that he was given a slip of paper with Mrs. Riley's name on it indicating her stress test was positive/abnormal and that she needed

to have a heart catheterization with possible PCI scheduled.  Mr. Parker explained that because he was notified of the need to schedule Mrs. Riley's catheterization in this manner (*i.e.,* piece of paper being left for him as opposed to Dr. Mitchell calling or speaking directly to him), he understood that the catheterization could be scheduled as an "elective" catheterization as opposed to an urgent or emergent cath. (Doc. 79-5 at 35–36, 67).  Mr. Parker indicated elective catheterizations should be scheduled within six to eight weeks. *Id.* at 129–130.  An electronic medical record dated November 7, 2014, reflects Mrs. Riley was informed and the procedure was scheduled for December 5, 2014.  (Doc. 79-1 at 34).  The reason for the procedure being scheduled one month later is not explained in her medical record, but Mr. Parker testified that Mrs. Riley indicated she wanted to schedule the catheterization procedure after the Thanksgiving holiday. *See* (Doc. 79-5 at 138–39).  Mr. Parker's hand-written notes in the medical record reflect the date of the procedure was later changed from December 5 to December 12, 2014, and changed again to January 12, 2015.  (Doc. 79-1 at 54).  There is nothing in the electronic medical record regarding these date changes or the reasons why.[2]  The extent of Mr. Parker's hand-written documentation is:

> LHC w/ poss PCI 12-05-14 @ 7:00
> Δ to 12-12-14 @ 7:00
> Δ to 1-12-15 @ 7:00
> Refused Westermeyer

*Id.*

Mr. Parker testified he has no independent recollection of interactions with Mrs. Riley from 2008 through October 30, 2014.  (Doc. 79-5 at 85).  He recalls, however, that when he called her on November 7, 2014, to schedule the catheterization procedure, she wanted to schedule it after the Thanksgiving

---

[2] Plaintiff notes the absence of any electronic or written documentation regarding the reason for the change in appointment date, any communications regarding Dr. Westermeyer's services being offered, questions regarding her physical status, or requests to delay the procedure until after the holidays.  Plaintiff argues the lack of documentation is in stark contrast to the clear documentation contained in her medical record regarding the procedures performed by The Heart Center in 2008 and 2011 when The Heart Center communicated with Mrs. Riley regarding her positive stress test results and scheduled her for a catheterization procedure that subsequently resulted in a PCI being performed. (Doc. 79-1 at 44).

holiday.  *Id.* at 138.  At that time, he questioned her regarding her symptoms and instructed her to call the office or present to the emergency room if she developed chest pain or shortness of breath.  *Id.* at 141–43.

Mrs. Riley presented to the clinic of her primary care doctor on November 5, 2014, the day after her echocardiogram.  She saw Dr. Cordon Bittner on that date for complaints of lower abdominal pressure, lower back pain, slight tenderness in her left leg, urinary frequency, and nocturia.  (Docs. 79-6 at 2; 79-7 at 4).  Mrs. Riley had no complaints of cardiac symptoms at that time.  (Doc. 79-6).  Dr. Bittner diagnosed urinary tract infection and told her to return or present to the emergency department if her condition worsened.  *Id.*; *see also* (Doc. 79-7 at 7).

On or about December 3, 2014, personal health issues required Dr. Mitchell to take a leave of absence from his practice.  (Doc. 79-2, ¶ 8).  He made arrangements with board-certified cardiologist Dr. Scott Westermeyer to cover his practice during the period of absence.  *Id.*

Mr. Parker contacted Mrs. Riley to advise her that Dr. Mitchell would be unavailable to conduct the procedure on December 5, 2014, but that Dr. Westermeyer who was covering for Dr. Mitchell was available to perform the procedure.  (Doc. 79-5 at 153).  According to Mr. Parker, Mrs. Riley refused Dr. Westermeyer and requested the procedure be rescheduled for a date that Dr. Mitchell was available. *Id.*  The procedure was rescheduled to December 12, 2014.  *Id.*  When it was determined that Dr. Mitchell would not be returning to his practice by December 12, 2014, Mr. Parker called Mrs. Riley again to let her know that Dr. Mitchell was still unavailable, but that Dr. Westermeyer could perform the procedure. *Id.* at 198, 201, 204.  Mr. Parker testified that Mrs. Riley wanted the procedure rescheduled and reported no current cardiac symptoms.  The appointment was rescheduled to January 12, 2015.

Mrs. Riley saw Dr. Solt on December 12, 2014, for complaints of lower abdominal pressure, lower back pain, pressure with urination, polyuria, and nocturia.  (Doc2. 79-6 at 2; 79-7 at 2).  Dr. Solt discussed her cardiac health, and Mrs. Riley had no complaints of any recent pain or pressure in her chest or recent cardiac symptoms.  (Doc. 79-6 at 2).  Dr. Solt diagnosed bladder spasm and instructed

her to return if she experienced a worsening of symptoms or present to the emergency room.  *Id.*; *see also* (Doc. 79-7 at 3).

On December 16, 2017, a nitrostat prescription for Mrs. Riley, originally written by Dr. Mitchell, was renewed and was picked up by Mrs. Riley or someone on her behalf on December 19, 2014.  (Doc. 88-6).  According to Plaintiff, from the time Mrs. Riley saw Dr. Mitchell on October 30, 2014, through her death on December 24, 2014, Mrs. Riley continued to have periodic episodes of chest tightness or pressure.  (Doc. 88-3 at 80–81).  She also testified that Mrs. Riley was beginning to feel like herself again closer to Christmas and appeared to be at her baseline.  *Id.* at 60, 83.

Mrs. Riley died in her sleep on either December 23 or 24, 2014.  (Doc. 88-8, ¶8).  She was found unresponsive by a family member the morning of December 24, 2014, at her home in LaGrange, Troup County, Georgia. *Id.*, ¶7.  The Troup County Coroner, Jeffrey M. Cook, was called to her home, and he pronounced her death, not Dr. Solt as indicated on the death certificate. *Id.,* ¶9.  While still on the scene, Mr. Cook was informed by a member of the LaGrange Police Department that Mrs. Riley's regular primary care physician, Dr. Solt, would be handling the completion of Mrs. Riley's death certificate and certifying her cause of death. *Id.*, ¶10.  After pronouncing Mrs. Riley's death, Mr. Cook surrendered jurisdiction and/or responsibility for completing Mrs. Riley's death certificate to Dr. Solt. *Id.*

No autopsy was performed.  (Doc. 79-6, ¶7).  The death certificate lists the cause of death as "cardiovascular disease due to or as a consequence of myocardial infarction."  (Doc. 79-2 at 62).  Dr. Solt testified he did not prepare the death certificate, nor does he agree with the listed cause of death.  (Doc. 79-6, ¶7).  Rather, he states in his affidavit that "Mrs. Riley was at risk for sudden death from other etiologies including arrhythmia and pulmonary embolus." *Id.*  Had he been the one to prepare the death certificate, he would have attributed her death to "cardiovascular arrest." *Id.*

Plaintiff brought suit against Defendants in October 2016. (Doc. 1).  In her Amended Complaint, Plaintiff alleges Defendants were negligent and breached the standard of care by failing to timely identify, address, and respond to Mrs. Riley's complaints made at her October 30, 2014 office visit; in

9

failing to take timely and appropriate action in response to her abnormal stress echocardiogram test done November 4, 2014; in failing to perform a heart catheterization with possible percutaneous intervention at any point between October 30 and December 24, 2014; and in failing to obtain informed consent to reschedule her catheterization procedure.  (Doc. 44).  She alleges Defendants' negligence and breaches of the standard of care resulted in Mrs. Riley's untimely death on December 24, 2014.  *Id.*, ¶ 31.

## IV.  DISCUSSION

### A.  *Daubert Motions*

#### 1.   Kevin Sublett, M.D.

Plaintiff seeks to exclude the testimony and proposed opinions of Dr. Sublett on the basis his opinions do not meet the standards for admissibility of medical expert testimony because he testifies as to plausible, not probable, causes of Mrs. Riley's death. (Doc. 81).  Dr. Sublett is a board certified interventional cardiologist who opines that the care and treatment of Mrs. Riley by Dr. Mitchell and The Heart Center was reasonable, appropriate, and within the standard of care.  (Doc. 81-2).  Although Defendants oppose Plaintiff's motion, they have withdrawn Dr. Sublett as an expert witness for trial, thus rendering Plaintiff's motion moot. (Doc. 85).  Accordingly, it is recommended that Plaintiff's Motion to Exclude Kevin Sublett, M.D. (Doc. 81) be **denied as moot** as the witness has been withdrawn.

#### 2.   Arthur Scott Westermeyer, M.D.

Plaintiff has moved to exclude the opinion testimony of Dr. Westermeyer on the basis that his opinions were not timely disclosed pursuant to Fed. R. Civ. 26 and they do not meet the scientific standard of *Daubert*.  (Doc. 80).  Dr. Westermeyer is board certified in internal medicine with a subspecialty in cardiovascular disease.  (Doc. 80-2 at 32:17–21).  Dr. Mitchell retained the services of Dr. Westermeyer to cover for him at The Heart Center when Dr. Mitchell took an approximate two-week leave of absence in December 2014 due to health reasons.  In their expert witness disclosures served in January 2018, Defendants identified Dr. Westermeyer as a potential expert witness expected to testify

regarding Mrs. Riley's condition and course of care.  (Doc. 80-1 at 3–4).  No expert report was provided for Dr. Westermeyer.

In his deposition taken in February 2018, Dr. Westermeyer testified that he never provided care for Mrs. Riley.  When he was covering for Dr. Mitchell, Dr. Westermeyer did not know Mrs. Riley was a patient of Dr. Mitchell's, had no knowledge of her condition, and was never asked for his advice or medical opinion regarding her condition.  After reviewing some medical records for Mrs. Riley the day before and the morning of his deposition, Dr. Westermeyer testified that the care and treatment of Mrs. Riley by Dr. Mitchell and The Heart Center was medically reasonable.  Plaintiff seeks to strike Dr. Westermeyer as an expert because he clearly was a consultant, as opposed to a treating doctor, and he failed to produce an expert report in accordance with Rule 26(a)(2)(B).  Additionally, Plaintiff argues Dr. Westermeyer's cursory review of records falls far short of meeting the standards established by *Daubert* and its progeny for the admissibility of medical expert opinions.

Defendants respond that Dr. Westermeyer is a board-certified cardiologist who covered Dr. Mitchell's practice during his medical leave and is being offered as a fact witness whose testimony involves specialized medical opinions.  (Doc. 84).  Because Dr. Westermeyer was not a retained expert specially employed to give expert opinions, Defendants argue there was no requirement to provide a report under Rule 26(a)(2)(B).  And even if a report was required, Defendants contend the failure to provide one was harmless where Plaintiff had the opportunity to fully depose the witness.

Defendants' disclosure of Dr. Westermeyer was as a treating physician.  (Doc. 80-1 at 3–4).  Defendants contend that a report was therefore not required under Fed. R. Civ. P. 26(a)(2)(B).  It became clear from the doctor's deposition testimony, however, that he did not treat Mrs. Riley nor offer advice or consultation regarding her.  As such, to the extent he is offering expert medical opinions, he would be considered a testifying expert for whom a report under Rule 26 would be required.  Defendants' response to the motion and Dr. Westermeyer's deposition suggest he may offer opinions as to the accuracy of the cause of death listed on the death certificate, the nature of Mrs. Riley's chest pain, an interpretation of

Mrs. Riley's stress echocardiogram, and treatment expectations of a cardiology specialist. These types of expert opinions by a non-treating physician are the reason for Rule 26's requirement that an expert report be provided. Defendants' suggestion that there was no harm that a report was not furnished since Plaintiff had the opportunity to depose Dr. Westermeyer is without merit because the same argument could be made for nearly every expert to justify the failure to provide a report.

Accordingly, it is recommended that Plaintiff's Motion to Exclude Opinion Testimony of Arthur Scott Westermeyer, M.D. (Doc. 80) be **granted in part** to the extent that Dr. Westermeyer be precluded from offering any opinions in this case related to the standard of care and/or causation. It is further recommended the motion (Doc. 80) be **denied** to the extent that Dr. Westermeyer should be permitted to testify as a fact witness as to what he did and observed as the covering cardiologist for Dr. Mitchell.

### 3. Alain Bouchard, M.D. and Oscar Julian Booker, M.D.

Plaintiff challenges the admissibility of the testimony and opinions of Dr. Bouchard and Dr. Booker on the basis that their opinions fail to meet the standards for scientific evidence as articulated in *Daubert*. (Docs. 82 at 1, 83 at 1).

An interventional cardiologist, Dr. Bouchard offers multiple opinions regarding Mrs. Riley's cause of death. Specifically, Dr. Bouchard disagrees with the cause of death listed on the death certificate. He opines instead as to alternative possible explanations for Mrs. Riley's death including sudden death due to untreated sleep apnea, obstructive sleep apnea, arrhythmia secondary to an electrolyte imbalance, pulmonary embolus, pulmonary hypertension, stroke, or a subacute septic process. (Doc. 86 at 2). He testified that the medical literature has proven to interventional cardiologists that coronary intervention simply helps with chest pain but does not prevent myocardial infarction or sudden death in patients like Mrs. Riley. (Doc. 79 at 18).

Dr. Booker is a board certified cardiologist who opines that there is no reliable scientific evidence to prove Mrs. Riley died from a myocardial infarction or an ischemic cardiac arrhythmia. (Doc. 83-2 at 1). He agrees with Dr. Mitchell's observation that a non-ischemic arrhythmia was a more likely

explanation for her death.  *Id.* at 3.  He further opines that if she did suffer a cardiac arrhythmia, it was more likely secondary to her recent history of hypokalemia.  *Id.*  In his opinion, her non-compliance with her CPAP therapy also put her at increased risk of experiencing a non-ischemic arrhythmia.  *Id.* Given Mrs. Riley's comorbidities, he identifies other plausible causes of death including stroke, pulmonary thromboembolus, pulmonary hypertension, or a subclinical septic process that manifested with rapid onset.  *Id.*

        a.    *Qualifications*

The first requirement for the admissibility of expert testimony under Rule 702 or *Daubert* is that the expert is qualified to testify competently regarding the matters he or she intends to address. *Kilpatrick*, 613 F.3d at 1335.  Plaintiff's motions do not call into question Dr. Bouchard and Dr. Booker's qualifications generally, and a review of the experts' resumes (*see* Docs. 82-2 at 5–11; 83-2 at 4–9) reveals that both Drs. Bouchard and Booker are accomplished cardiologists and appear competent to provide the causation opinions offered here.

Rather, Plaintiff challenges the experts' qualifications to the extent that Drs. Bouchard and Booker are not specialists in the fields that primarily treat some of these disease processes, such as sleep apnea.  *See, e.g.*, (Doc. 82 at 7; 83 at 6–7).  She claims these experts are therefore unqualified to offer opinions that the disease processes, such as complications from sleep apnea, are a potential cause of Mrs. Riley's death.  However, Dr. Bouchard and Dr. Booker are not offering opinions about the treatment of the other disease processes, but instead have opined that these other etiologies for sudden death are equally plausible based upon Mrs. Riley's medical history.  Accordingly, the court finds that Dr. Bouchard and Dr. Booker's qualifications satisfy the initial requirement for admissibility of expert testimony under Rule 702.

        b.    *Reliability of the Methodology*

The Court must next evaluate the methodology used by the expert, which usually involves application of the four-factor *Daubert* test: (1) whether the expert's theory can be and has been tested;

(2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. See *Kilpatrick*, 613 F.3d at 1335 (citing *Daubert*).   Plaintiff argues the experts' "shotgun approach" to explaining Mrs. Riley's cause of death is not a reliable method, nor does it rise to the level of intellectual rigor required under the law. (Docs. 82 at 6; 83 at 5).  As Defendants point out, Plaintiff bears the burden of proof here.  In presenting their defense, defendants will routinely offer expert testimony advancing alternative plausible explanations to refute a plaintiff's theory of causation and liability. Dr. Bouchard and Booker provide multiple plausible and scientifically supported explanations for Mrs. Riley's cause of death, which even the Plaintiff's experts acknowledge cannot be ruled out given the lack of autopsy. Additionally, Dr. Booker opines that the overwhelming evidence now accepted within the field of cardiology is that intervention in patients with stable coronary artery disease or stable angina from coronary artery disease can relieve or improve symptoms, but does not necessarily prevent acute myocardial infarction or death.  (Doc. 83-3 at 229–30).  This testimony is based on a widely-published study on coronary intervention known as the COURAGE trial.  *Id.*  Dr. Bouchard similarly testified that the literature has proven that while coronary intervention helps with chest pain, it does not prevent myocardial infarction or sudden death in patients like Mrs. Riley.  (Doc. 82-3 at 211–12).  Dr. Bouchard and Dr. Booker's opinions on the issue of causation are supported by general medical knowledge, the facts of this case, and peer-reviewed literature and therefore satisfy the second requirement of the three-part inquiry.

c.    *Assistance to the Trier of Fact*

Finally, the court must consider whether the expert's testimony will assist the trier of fact.  "Expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).  In medical malpractice cases, the "plaintiff must prove the alleged negligence through expert testimony, unless an understanding of the alleged lack of due care or skill requires only common knowledge." *Shanes v. Kiser*, 729 So. 2d

319, 320–21 (Ala. 1999). Here, Dr. Bouchard's and Dr. Booker's testimony would be reliable and helpful to the trier of fact in explaining the various medical etiologies. Thus, all three requirements are satisfied, and Plaintiff's motions to preclude Dr. Bouchard and Dr. Booker (Docs. 82, 83) are due to be **denied**.

### 4. <u>Bruce D. Charash, M.D. and Winston Gandy, M.D.</u>

Defendants move to preclude the testimony and opinions of Plaintiff's experts, Dr. Charash and Dr. Gandy. (Doc. 79). Dr. Charash is Board Certified in internal medicine with board certification in the subspecialty of cardiovascular disease. (Doc. 76-1 at 1). He has been a practicing cardiologist in his field of specialty since 1987, and has taught other physicians in his area of specialty at Cornell University. *Id.* Dr. Charash opined that Defendants breached the standard of care in not urgently scheduling Mrs. Riley's heart catheterization within a week of the abnormal stress test and in rescheduling the procedure from December 5 to December 12, 2014, and in rescheduling again to January 12, 2015. *Id.* at 10–11. He opines a physician should have been informed of Mrs. Riley's medical circumstances and she should have been informed of the risks associated with delaying the procedure. *Id.* He further opines that Defendants failed to appropriately ensure Mrs. Riley's health issues and problems were addressed, considered, and handled during Dr. Mitchell's period of absence. *Id.* at 11. Finally, he opines that "Mrs. Riley died as a result of a myocardial infarction caused by her recurrent cardiovascular disease (ischemic heart disease)." *Id.* at 12. He states that the Defendants' breaches of the standard of care in not timely scheduling the procedure caused Mrs. Riley's death and had the catheterization and PCI been performed earlier than more likely than not Mrs. Riley would not have died. *Id.*

Dr. Gandy has been Board Certified in internal medicine since 1989 and in the subspecialty of cardiovascular disease since 1991. (Doc. 76-3 at 1). He has been a practicing cardiologist since 1992, and has taught other physicians in his area of specialty for many years. *Id.* Dr. Gandy opines that given Mrs. Riley's complaints and her cardiac history that her catheterization procedure should have been

scheduled within one to two weeks of her abnormal stress test on November 4, 2014, and Defendants'

failure to timely schedule the procedure as well as the subsequent multiple times rescheduling of the

procedure violated the standard of care. *Id.* at 10–11. Like Dr. Charash, Dr. Gandy similarly opines that

a physician should have been informed of Mrs. Riley's medical circumstances, she should have been

informed of the risks associated with delaying the procedure, and that Defendants failed to appropriately

ensure Mrs. Riley's health issues and problems were addressed, considered, and handled during Dr.

Mitchell's period of absence. *Id.* at 11. It is Dr. Gandy's opinion that Mrs. Riley died of a heart attack

caused by her recurrent cardiovascular disease. *Id.* at 12. He opines that if Defendants had timely

performed a heart catheterization and PCI, it is more likely than not that Mrs. Riley would not have died.

*Id.*

  a.  *Qualifications*

  Defendants contend Plaintiff's experts, Drs. Charash and Gandy, are not qualified to offer

opinions in this case because they are not interventional cardiologists. Specifically, Defendants argue

Plaintiff's experts fail to satisfy the criteria of ALA. CODE § 6-5-548(b)[3] because neither physician holds

training or experience as an interventional cardiologist. (Doc. 79 at 29). Dr. Mitchell is not board

certified in the subspecialty of interventional cardiology. Because he practices and holds himself out as

an interventional cardiologist, however, Defendants contend any opposing expert must also be a certified

---

[3] Section 6-5-548 provides in pertinent part:
> (b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a "similarly situated health care provider" is one who meets all of the following qualifications:
> (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
> (2) Is trained and experienced in the same discipline or school of practice.
> (3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.

Ala. Code § 6-5-548(b).

or practicing interventional cardiologist.  On the facts of this case, the court declines to recommend precluding these experts on this basis.

Like Dr. Mitchell, both Drs. Charash and Gandy are board certified cardiologists.  Plaintiff argues the central breach in this case was Dr. Mitchell's failure to appropriately diagnose Mrs. Riley's cardiac condition as unstable angina and high-risk as indicated by her complaints of recent onset chest pain and tightness at rest, and her abnormal stress test on November 4, 2014, suggestive of ischemia. (Doc. 88 at 6).  Plaintiff submits that the standard of care criticisms here involve the specialty of cardiology, *i.e.*, the care and treatment routinely performed by a physician certified in the subspecialty of cardiovascular disease and do not involve the practice of interventional cardiology.  As it relates to the standard of care and Mr. Parker's conduct, Mr. Parker is not a Defendant in this case, but rather an employee of Defendant The Heart Center.  Alleged violations of the standard of care as it relates to his conduct in the scheduling and rescheduling of Mrs. Riley's procedure would fall within the purview of The Heart Center's responsibility.  The court finds that Drs. Charash and Gandy are appropriately qualified to offer expert medical testimony on these matters.

b.     *Reliability of the Methodology and Assistance to the Trier of Fact*

In considering the reliability of the experts' methodology, the court finds Plaintiff's experts have not adequately supported their causation opinions, particularly given the lack of an autopsy.  Their opinions that Mrs. Riley had a blockage that would have led to life-saving intervention had a heart catheterization been done prior to December 24, 2014 is speculative.  Neither Dr. Gandy nor Dr. Charash can specify a degree of blockage in any given vessel which would have been identified on catheterization and probably would have been deemed appropriate for intervention. Compounding the speculation, nothing in the record or their analyses provides any basis to conclude that the procedure would have been efficacious, particularly given her comorbidities.

Dr. Charash's opinions are premised on the incorrect assumption that Mrs. Riley's treating physician, Dr. Solt, identified the cause of death as myocardial infarction, but Dr. Solt did not reach that

conclusion and was not the one to fill out the death certificate.  Moreover, Dr. Charash acknowledges that there was not any test or study that was done or could have been done (except for an autopsy) that would have ruled out other causes of death such as complications related to obstructive sleep apnea or electrolyte imbalance.  (Doc. 79-11 at 114–15).  He admits that Mrs. Riley had a significant number of risk factors for other potential causes of death, independent of cardiac disease, including a cardiac arrhythmia from an electrolyte imbalance, obstructive sleep apnea, stroke, pulmonary thromboembolism, and abdominal aortic aneurysm.  *Id.* at 106, 110–12, 114–15, 117–22, 127–28.

Like Dr. Charash, Dr. Gandy acknowledges that Mrs. Riley had a number of comorbidities which placed her at risk for other potential causes of death including a fatal non-ischemic cardiac arrhythmia secondary due to an electrolyte imbalance, obstructive sleep apnea, thromboembolism, stroke, and ruptured abdominal aortic aneurysm.  (Doc. 79-12 at 50–53, 117–18, 120, 122, 129, 134, 137, 140–142). He concedes that the circumstances surrounding her sudden death, without an autopsy, have "no distinguishing factor" and "look the same" as a death from causes associated with her known comorbid conditions.  *Id.* at 120:7–13, 126:25–127:10, 130:14–20, 142:17–25, 143:1–23, 149:12–21, 150:14– 151:6).  Dr. Gandy acknowledges there was no autopsy, and he disagrees with the stated cause of death on the death certificate. *Id.* at 136:14–25, 145:13–146:25.  Dr. Gandy further acknowledges the existence of studies finding that revascularization procedures may alleviate symptoms for clinical improvement, but may not improve longevity.  *Id.* at 115:15–117:10.   Dr. Charash and Gandy fail to sufficiently exclude the numerous other plausible causes of Mrs. Riley's death to make their testimony reliable and helpful to a jury. *See* Fed. R. Evid. 702, Advisory Committee Notes (2000 Amend.) ("Courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact[, including] … [w]hether the expert has adequately accounted for obvious alternative explanations.")  Further, given the lack of autopsy, there is no scientific evidence that would distinguish her death from being caused by her other comorbidities versus a failure to perform an interventive catheterization.   Unfortunately, individuals who are ill

(especially cardiac patients with comorbidities) sometimes die despite the best care. In the absence of a post-mortem, these doctors are just guessing as to both what proximately led to Mrs. Riley's death and whether intervention at some earlier date would have materially helped her.   The opinions of Drs. Charash and Gandy are therefore due to be excluded.

B.   *Defendants' Motion for Summary Judgment*

The Alabama Supreme Court has explained:

> To prevail on a medical-malpractice claim, a plaintiff must prove 1) the appropriate standard of care, 2) the [health-care provider's] deviation from that standard, and 3) a proximate causal connection between the [health-care provider's] act or omission constituting the breach and the injury sustained by the plaintiff.
> …
> The rule in Alabama in medical malpractice cases is that to find liability, there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury. There must be evidence that the negligence probably caused the injury.

*Hrynkiw v. Trammell*, 96 So. 3d 794, 796–97, 806 (Ala. 2012) (internal quotations and citations omitted). "To prove causation in a medical malpractice case, the plaintiff must prove through expert medical testimony that the alleged negligence probably, rather than only possibly, caused the plaintiff's injury." *Bradley v.* Miller, 878 So. 2d 262, 266 (Ala. 2003).  Here, because Plaintiffs' experts failed to sufficiently rule out the number of other plausible explanations for Mrs. Riley's death and their opinions are due to be precluded, Plaintiff is unable to establish Defendants' alleged negligence probably caused Mrs. Riley's injury under Alabama law.

In Alabama, there is no recovery in a medical malpractice wrongful death action just for having lost a possible chance of survival.  *See Williams v. Springhill Mem. Hosp.*, 646 So. 2d 1373, 1375 (Ala. 1994).   Instead, when there is an issue of dilatory diagnosis and treatment, such as the circumstances alleged here, there must be sufficient evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of the inferior medical care. *Hrynkiw*, 96 So. 3d at 806 (citing *DCH Healthcare Auth. v. Duckworth*, 883 So.2d 1214 (Ala. 2003)).  Plaintiff's evidence fails to demonstrate that the failure to perform the heart catheterization prior to December 24, 2014,

caused Mrs. Riley's death or if the procedure had been performed, would have placed her in a better position in light of her other comorbidities.

As the Alabama Supreme Court has explained,

> [T]he proof must go further than merely show that an injury could have occurred in an alleged way—it must warrant the reasonable inference and conclusion that it did so occur as alleged. Moreover, an inference merely that it could so occur does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause. Regarding causation, this Court has also said:

> Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.

> But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. Verdicts may not be rested upon pure supposition or speculation, and the jury will not be permitted to merely guess as between a number of causes, where there is no satisfactory foundation in the testimony for the conclusion which they have reached.

*Shanes*, 729 So. 2d at 320–21 (internal quotations and citations omitted).  The Alabama Supreme Court has repeatedly held that "[i] is well settled that when the defendant in a medical malpractice case moves for a summary judgment and makes the requisite *prima facie* showing of nonliability, … the plaintiff, in order to avoid the entry of a summary judgment for the defendant, must present substantial evidence indicating that the alleged negligence … probably caused the injury."  *Dews v. Mobile Infirmary Ass'n*, 659 So. 2d 61, 64 (Ala. 1995).  As discussed above, Plaintiffs' experts are due to be excluded from offering their causation opinions, and therefore Plaintiff is without competent expert testimony to establish a breach of the standard of care or a proximal causal connection between any alleged breach and Mrs. Riley's death.  For the foregoing reasons, it is recommended that Defendants' Motion for Summary Judgment (Doc. 79) be **granted**.

C.   *Motion to Strike and Preclude Plaintiff's Use of Medical Literature*

Defendants have moved to strike (Doc. 92) the medical literature attached to Plaintiff's response to Defendants' Motion to Preclude and Motion for Summary Judgment.  Given the conclusion above that Defendants' Motion (Doc. 79) is due to be granted, the motion to strike (Doc. 92) is due to be **denied as moot**.

## V.   RECOMMENDATION

Accordingly, it is respectfully **RECOMMENDED** as follows:

1.   Plaintiff's Motion to Exclude Opinion Testimony of Arthur Scott Westermeyer, M.D. (Doc. 80) be **granted in part** and **denied in part**;

2.   Plaintiff's Motion to Exclude Testimony and Opinions of Kevin Sublett, M.D. (Doc. 81) be **denied as moot**;

3.   Plaintiff's Motion to Exclude Testimony and Opinions of Alain Bouchard, M.D. (Doc. 82) be **denied**;

4.   Plaintiff's Motion to Exclude Testimony and Opinions of Oscar Julian Booker, M.D. (Doc. 83) be **denied**;

5.   Defendants' Motion to Preclude Plaintiffs' Experts and Motion for Summary Judgment (Doc. 79) be **granted** and that final **summary judgment be entered in Defendants' favor;** and

6.   Defendants' Motion to Strike and Preclude Plaintiff's Use of Medical Literature in Response to Defendants' Motion to Preclude and Motion for Summary Judgment (Doc. 92) be **denied as moot**.

## VI.   NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. Accordingly, it is hereby **ORDERED** that any objections to the Report and Recommendation shall be filed on or before **July 23, 2018**.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual

finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th

Cir. R. 3-1; see also 28 U.S.C. § 636(b)(1).

      **Respectfully recommended** this 9th day of July, 2018.


DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE