IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LATISA THORNTON, as | ) | |
| Administratrix of the Estate of | ) | |
| MILDRED RILEY, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-00829-RAH |
| | ) | **WO** |
| JOHN W. MITCHELL, M.D., and | ) | |
| THE HEART CENTER | ) | |
| CARDIOLOGY, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

## I.    Introduction

On December 24, 2014, Mildred Riley (Riley) was found dead at her home in LaGrange, Georgia, having passed away in her sleep.  At the time, Riley, a 71-year old woman with a number of comorbidities, was under the care and treatment of John W. Mitchell, M.D. (Mitchell), and his medical practice, The Heart Center Cardiology, P.C. (Heart Center) (collectively, medical defendants).  Because no autopsy was performed, Riley's precise cause of death was never medically determined.

Even so, Lisa Thornton (Thornton), as the administratrix of Riley's estate

1

(estate or plaintiff),[1] filed this suit under Alabama's Wrongful Death Statute, ALA. CODE (1975) § 6-5-410,[2] and the Alabama Medical Liability Act (AMLA), ALA. CODE (1975) § 6-5-480, *et seq*., claiming that Riley had died due to a myocardial infarction that would have been prevented had the medical defendants performed an interventional cardiac procedure in the weeks preceding Riley's death.  Through its two cardiologist experts—Dr. Bruce Davis Charash (Charash) and Dr. Winston Gandy (Gandy)—the estate contends that, while Riley could have *possibly* died from one of several other causes such as arrhythmia due to an electrolyte imbalance, sleep apnea or a pulmonary thromboembolism, the true culprit was either a myocardial infarction, according to one expert, or ischemia, according to another.  Conversely, the medical defendants point out that, due to comorbidities, any of a number of other ailments unrelated to Riley's cardiac condition could be the blame. After referral of a bevy of motions to the United States Magistrate Judge (Docs. 79-83, 89-94, 96), *see* 28 U.S.C. § 636(b), the Honorable David A. Baker (Magistrate Judge) recommended that summary judgment be entered in the medical defendants' favor. (Doc. 108.)  He did so "because Plaintiffs' experts failed to sufficiently rule out multiple other plausible explanations for Mrs. Riley's death" and, therefore,

---

[1] Although Thornton is technically this matter's plaintiff, she sues solely in her capacity as a representative of Riley's estate.  Consequently, this Court uses the terms "plaintiff" and "Riley's estate" interchangeably.

[2] In this Memorandum Opinion and Order, any reference to "Section []" or "§ []" is to a part of the Code of Alabama (1975).

"Plaintiff is unable to establish Defendants' alleged negligence probably caused Mrs. Riley's injury under Alabama law." (*Id.* at 19.)  In the report setting forth this recommendation (Report), the Magistrate Judge also concluded that the estate's medical experts, who were board-certified in internal medicine and cardiology, were sufficiently qualified to testify against the medical defendants, including Mitchell, a board-certified cardiologist practicing interventional cardiology.   On July 23, 2018, the parties challenged the Report in full or in part.  The estate filed its Objection to the Magistrate Judge's Report and Recommendation (Objection), (Doc. 110), and the medical defendants filed their Limited Objection to the Magistrate Judge's Report and Recommendation (Limited Objection), (Doc. 109).

Having carefully reviewed the record in this case, including the Report and the parties' objections thereto, the Court concludes the Objection is due to be overruled and the Report adopted to the extent the Report concludes that the estate failed to prove causation.  *See* 28 U.S.C. § 636(b).  The Court, however, sustains the medical defendants' Limited Objection to the extent it challenges the Magistrate Judge's conclusion that the estate's two experts were sufficiently qualified to testify to the standard of care allegedly breached by the medical defendants.  In short, the Court enters summary judgment in the medical defendants' favor for two reasons – the failures of the estate to create a question of fact on the issue of a breach of the standard of care and to provide sufficient evidence of causation to satisfy the

3

applicable substantive and procedural standards.

## II.      Standard of Review

When a party objects to a magistrate judge's report and recommendation, this Court must review the disputed portions *de novo.*  28 U.S.C. § 636(b).  It "may accept, reject, or modify the recommended disposition; receive further evidence; or resubmit the matter to the magistrate judge with instructions."  FED. R. CIV. P. 72(b)(3).  *De novo* review requires the district court to independently consider factual issues based on the overall record. *Jeffrey S. ex rel. Ernest S. v. State Bd. of Educ.*, 896 F.2d 507, 513 (11th Cir. 1990); *see also United States v. Gopie,* 347 F. App'x 495, 499 n.1 (11th Cir. 2009) (explicating standard).[3]  However, objections to any report and recommendation must be sufficiently specific to warrant this kind of rigorous review. *See Macort v. Prem, Inc.,* 208 F. App'x 781, 783-85 (11th Cir. 2006) (applying relevant touchstone). Otherwise, a clear error standard applies. *Id.*

## III.      Summary Judgment Facts

On either December 23 or 24, 2014, Riley died in her sleep.  (Doc. 88-8 ¶ 8; *see also* Doc. 79 at 15-16; Doc. 79-1.)  According to the police report, her husband found her "dead on the bed" in the morning of December 24, 2014.  (Doc. 110-1 at 1.)  He soon thereafter called Thornton, Riley's daughter (and his stepdaughter), who

---

[3] Although unpublished opinions, generally denominated by a cite to the Federal Appendix or some electronic medium, "are not considered binding precedent . . . , they may be cited as persuasive authority." 11th Cir. R. 36-2.  The Court treats them as such here and elsewhere.

promptly called 911.  (*Id.*)  By her husband's reckoning, Riley had gone to bed around 10:00 p.m. on December 23, 2014.  (*Id.*) When she had spoken to her daughter earlier that day, she had "appeared to be fine."  (*Id.*)

Unfortunately, controversy hangs over Riley's death certificate.  As written, this legal document identified her cause of death as "cardiovascular disease due to or as a consequence of a myocardial infarction." (Doc. 79-6 ¶ 7.)  Purportedly, Gary R. Solt, M.D. (Solt), Riley's primary care doctor, prepared this document.  (*See* Doc. 79-1; Doc. 88 at 25-27.)  In subsequent testimony, however, Solt admitted that he "did not pronounce . . . [her] death" or "prepare or sign her death certificate" and instead regarded Riley as "at risk for sudden death from other etiologies, including arrhythmia and pulmonary embolus."  (Doc. 79-6 ¶ 7; *see also* Doc. 99.)  In Solt's opinion, "because no autopsy was conducted," Riley's death should thus have been "attributed . . . . . simply to 'cardiovascular arrest'" brought on by an unknown cause. (Doc. 79-6 ¶ 7.)

In fact, based on the available records, at the time of her passing, Riley's health was, at best, precarious and embattled.  She suffered from numerous medical debilities, including morbid obesity, coronary artery disease, high cholesterol, hypertension, peripheral arterial disease, sleep disorder, and thyroid disease.  (Doc. 79-1; *see also* Doc. 79-4 at 13-14.)  She simultaneously exhibited many other risk factors, such as her gender (female), seventy-one years (greater than 55), atherogenic

diet, sedentary lifestyle, family history of heart disease, prior history of myocardial infarction, documented atherosclerotic cardiovascular disease, and noncompliance with CPAP, short for continuous positive airway pressure therapy. (Doc. 79-1; *see also* Doc. 79-4 at 13-15; Doc. 79-7.) Solt's files, among others, attest to these myriad problems. (*See* Doc. 79-7; *see also* Doc. 79-4 at 13-16, 37-38, 41, 47; Doc. 79-6 ¶ 7.)

Over a period of six years beginning in 2008, Riley had been under the cardiac care of Mitchell, an interventional cardiologist in Auburn, Alabama. (*See* Doc. 79-4 at 15-34.) She had undergone coronary artery bypass surgery in 2009 and recurrent disease with percutaneous intervention in 2011. (Doc. 79-4 at 42-43.) Because Riley complained of chest pain and tightness on October 30, 2014, Mitchell scheduled and Riley underwent a stress echocardiogram on November 4, 2014. (Doc. 79-4 at 37-47.) Mitchell interpreted this test as being positive/abnormal, thereby suggesting a worsening of an underlying ischemic disease. (Doc. 79-1 at 78-81; Doc. 79-4 at 16-19, 48-50.) As a result, Mitchell recommended Riley undergo a catheterization with possible percutaneous intervention (for example, balloon angioplasty with stenting). (Doc. 79-4 at 17-19.)

The procedure initially was scheduled for December 5, 2014, but was rescheduled for December 12, 2014 and then again for January 12, 2015. (Doc. 79-1 at 34, 54, 78.) According to Mitchell's medical assistant, Tim Parker (Parker), the

catherization was set for December at Riley's request, and then shifted to January, again at her request, so that Mitchell personally could perform the procedure.  (Doc. 79-5 at 138-39, 153, 198, 201, 204.)  Notably, Riley did not describe or reveal any cardiac symptoms during any phone calls with Parker regarding her procedure.  (*Id.* at 35, 39, 50-51.)  As such, when Riley was discovered deceased on the morning of December 24, 2014, the interventional procedure had not yet been performed.

## IV.  Discussion

This "Medical Malpractice Death Case" implicates two distinct bodies of law. (Doc. 44.)  Alabama state law, as codified in the AMLA and construed by this state's courts, creates the underlying rights and duties for whose vindication and violation the estate has sued the medical defendants.  (*See, e.g.*, *id.* at 10-12.)  Because the estate opted to file in this Court (Doc. 1), federal law governs evidence, pleading, and procedure.  *E.g.*, *S. Pac. Transp. Co. v. Smith Material Co.*, 616 F.2d 111 (5th Cir. 1980); *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 604 F.2d 950 (5th Cir. 1980); *see also, e.g.*, *Ass'n of Am. R.Rs. v. Interstate Commerce Comm'n*, 600 F.2d 989, 995-96 (D.C. Cir. 1979) (expounding as to relevant distinction).  For these reasons, in considering the Report's merits, this Court will first look to the admissibility standard for expert testimony set forth in the Federal Rules of

Evidence,[4] specifically Evidence Rules 401, 403, 702, and 703, and then consider the substantive limitations imposed by Alabama law, all evaluated in light of the touchstone for summary judgment set forth in Civil Rule 56.  This distinction should not obscure an interrelationship between these bodies of law: if the estate has failed to provide enough admissible evidence, as defined by the Evidence Rules, to meet its burden under Alabama law for purposes of Civil Rule 56, the medical defendants must win.

### A.    Causation Issues

Like most medical malpractice actions, this litigation centers upon the competency of the parties' expert witnesses and the opinions that they may or may not give.  Naturally, therefore, both the estate and the medical defendants at one point moved to strike each other's expert witnesses and limit or altogether exclude their testimony.  (Docs. 79, 80, 81, 82, 83.)  The parties' objections to the Report challenge the Magistrate Judge's rulings on these issues.

In the Report, the Magistrate Judge concluded the "Plaintiff's experts have not adequately supported their causation opinions, particularly given the lack of an autopsy." (Doc. 108 at 17.)  As the Report explains, the experts' opinions that Riley, somewhere, had a blockage of a coronary artery which, in their medical opinion,

---

[4] In this Memorandum Opinion and Order, any reference to "Evidence Rule []" or "Evidence Rules" is to one or more provisions of this evidentiary compendium, and any reference to "Civil Rule []" or "Civil Rules" is to one or more of the Federal Rules of Civil Procedure.

caused her death either by a myocardial infarction (Charash) or cardiac dysrhythmia (Gandy) was speculative in the absence of an autopsy to establish her actual cause of death to the exclusion of all other possibilities.  (*Id.* at 17-18.)  The latter failure rendered their testimony unreliable and unhelpful to the jury and thus required that it be excluded.  (*Id.* at 18-19.)  With no competent testimony regarding proximate causation and death available, the Magistrate Judge concluded the estate had not met its burden of proof on causation, entitling the medical defendants to summary judgment.  (*Id.* at 19.)

The Objection faults the Magistrate Judge for misconstruing the medical testimony in two ways.  First, it points to the cause of death set forth in the death certificate. (Doc. 110 at 16.)   Second, the estate denies that its experts ever stated there was an "equal probability" that Riley's death was due to one of the other possible causes. (Doc. 88 at 53-68.)

Unsurprisingly, the medical defendants champion the Magistrate Judge's reasoning.  In their view, as the Report already persuasively explains, Riley's cause of death was never medically determined through autopsy, and there were multiple possible causes for Riley's sudden, unexpected death, especially given her comorbidities.  Based on these incontrovertible facts, the estate's experts' opinion testimony was speculative and conjectural.  Consequently, it could not and did not meet the requirements of Evidence Rule 702, as explained through *Daubert v.*

9

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the substantive law for expert testimony under AMLA.

By its terms, Rule 702 compels trial courts to "act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 597 n. 13). In this role, a court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237-38 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 593-94). The proposed testimony must derive from the scientific method or a process similar in analytical rigor; "good grounds and appropriate validation must support it." *Id.* at 1237 (citing *Daubert*, 509 U.S. at 590). "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 1238. "The court must consider the testimony with the understanding that '[t]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion . . . .'" *Id.* (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)).

"The 'gatekeeping' function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Masferrer*, 367 F.

Supp. 2d 1365, 1371 (S.D. Fla. 2005) (citing *McCorvey v. Baxter Healthcare Corp*., 298 F.3d 1253, 1257 (11th Cir. 2002)).  After all, an "expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."  *Id.*  "[N]o other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'"  *Frazier*, 387 F.3d at 1260 (quoting Evidence Rule 703).

A *Daubert* analysis consists of a two-pronged test: (1) whether the expert's testimony is reliable, being grounded in scientific knowledge; and (2) whether the testimony is relevant, thereby assisting the trier of fact to evaluate the issues in the case. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004).

As to the first prong, *Daubert* itself lists four non-exhaustive factors: whether the theory or technique "can be (and has been) tested"; "the known or potential rate of error"; "whether the theory or technique has been subject to peer review and publication"; and whether the scientific theory or technique has gained "general acceptance" in the relevant scientific community.  *Daubert*, 509 U.S. at 593-94. Other factors that a court may consider are "reliance on anecdotal evidence (as in case reports), temporal proximity, and improper extrapolation (as in animal studies)." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).  A

court must always focus on the purported expert's principles and methodology, "not on the conclusions they generate." *McDowell*, 392 F.3d at 1298.

The key to analyzing the second prong of *Daubert* is determining whether the expert's testimony could assist the trier of fact. *McDowell*, 392 F.3d at 1299 (citing Fed. R. Evid. 702). Logically, this "inquiry must be 'tied to the facts' of a particular 'case.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (citing *Daubert*, 509 U.S. at 591). In other words, "[t]he relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case. . . .[T]here is no fit where a large analytical leap must be made between the facts and the opinion." *McDowell*, 392 F.3d at 1299.

In this Circuit, "[a]n expert opinion is inadmissible when the only connection between the conclusion and existing data is the expert's own assertions." *Id.* at 1300; *see Ex parte Diversey Corp.*, 742 So. 2d 1250, 1254 (Ala. 1999) ("Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.") (internal citation omitted).

Upon *de novo* review and using the framework outlined above, the Court concludes the Magistrate Judge correctly applied Rule 702, as explained by *Daubert* and its progeny, in recommending the exclusion of testimony from Charash and Gandy. As to reliability, both experts' testimony about the cause of Riley's death

12

and its possible connection to the lack of a percutaneous interventional procedure of an undetermined type of an undetermined coronary artery lacks the appropriate scientific foundation and is too speculative and unreliable in nature to be considered "scientific knowledge," which the *Daubert* standard demands. Moreover, the Court agrees with the Magistrate Judge that these experts' opinions would not be helpful to the jury due to this incontestable uncertainty, and so it would be excluded as irrelevant under the Evidence Rules.

In light of this case's record, two reasons prompt this Court to conclude that the estate has run afoul of *Daubert*.

First, as all the parties concede, the lack of an autopsy makes it objectively impossible to ever medically determine Riley's actual cause of death, rendering the opinion of any expert, including plaintiff's duo, no more than an educated guess, at best, or wild conjecture, at worst.[5] By definition, an autopsy is a detailed medical examination of a person's body and organs after death so as to ascertain its cause. *See* PAUL C. GIANNELLI, EDWARD J. IMWINKELRIED, ANDREA ROTH & JANE CAMPBELL MORIARTY, SCIENTIFIC EVIDENCE § 19.03 (5th ed. 2020) (discussing pathology); *cf. Williams v. Illinois*, 567 U.S. 50, 98 (2012) (Breyer, J., concurring) ("Autopsies are typically conducted soon after death."). Autopsies can even be described as "the most important parts of forensic pathology, where establishing the

---

[5] Whether an autopsy would be admissible is a different question altogether.

exact cause and manner of death has important medical–legal implications," Louis M. Buja, *et al.*, *The Importance of the Autopsy in Medicine: Perspectives of Pathology Colleagues*, 6 ACADEMIC PATHOLOGY 1, 1 (2019), for it is only via such an analysis that the cause and manner of death can ever be specified with any degree of confidence, GIANNELLI ET AL., SCIENTIFIC EVIDENCE § 19.03.

In its absence, therefore, all that is and can be definitely known is the following: that Riley had sundry medical problems, some of which could lead to sudden, unexpected death; that she had been scheduled and then rescheduled at her request for a heart catheterization with possible percutaneous intervention; and that she died in her sleep at home before ever undergoing that procedure. That is certainly not enough to regard the kind of causes hypothesized by plaintiff's experts for a person whose physical health was as compromised as Riley's in December 2014 as both sufficiently objective under *Daubert* and sufficiently reasonable to create a genuine issue of material fact under Civil Rule 56.

That the death certificate listed the cause of death as a myocardial infarction, the estate's first basis for objection, is without consequence because the death certificate was not only unsupported by any medical testimony but was, in fact, discredited by the testimony of Solt, its purported author. That, plus the fact that death certificates generally are deemed unreliable as to cause of death if contradicted, renders Riley's death certificate void of reliability. *See Bradberry v.*

*Dir., Office of Workers' Comp. Programs,* 117 F.3d 1361, 1367 (11th Cir. 1997) (sustaining an objection on this basis, but conceding that an unsupported certificate contradicted by its author could be disregarded in certain circumstances); *Pickens v. Equitable Life Assur. Soc.*, 413 F.2d 1390, 1395 (5th Cir. 1969) (finding that a death certificate rebutted by its author and speculative to constitute more than adequate rebuttal)[6]; *Dudash v. Dir.*, 165 F. App'x 238, 241 (3d Cir. 2006) ("We have held that death certificates on their own, without supporting testimony or documentary or physical evidence derived from an autopsy, do not constitute reliable evidence on the question whether pneumoconiosis played a role in the death."); *see also Liberty Nat'l Life Ins. Co. v. Tellis*, 146 So. 616, 616 (Ala. 1933) ([Death certificates] "are to be taken as prima facie true . . . *unless contradicted or avoided by competent evidence . . . .*") (emphasis added).  In point of fact, as two doctors recently observed, "[t]he level of certainty required when opining about manner of death [in the typical death certificate] is 'more likely than not'," rarely, if ever, more.  Evan W. Matches & Sam W. Anders, *Autopsy as a "Dying Art"*, THE CHAMPION, Mar. 2018, at 32, 35.

Second, to add to the uncertainty of Riley's cause of death, the estate's two experts somewhat disagree as to Riley's cause of death, with Charash blaming a myocardial infarction and Gandy pegging cardiac dysrhythmia (ischemic

---

[6] Under *Bonner v. City of Pritchard*, the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.  661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

arrhythmia).   (Doc. 79-11 at 28-29; Doc. 79-12 at 37.)   When your own experts squabble, the case for finding fault in another's treatment of a woman racked with dangerous ills grows increasingly untenable.  *Cf. Sommer v. United States*, Case No. 09cv2093-CAB (BGS), 2013 U.S. Dist. LEXIS 203627 (S.D. Cal. Dec. 5, 2013) (opining that, when experts disagree, insufficient evidence to raise a genuine issue of material fact over the accuracy of a prior death determination exists).   Put differently, the words of plaintiff's own experts, on top of her inconclusive medical file, leaves it impossible to deem their testimony to be either rigorous or defensible enough to meet *Daubert*'s minimum.

These weaknesses offend more than just *Daubert*.  To prove causation in a medical-malpractice case under Alabama law, as attempted here, a plaintiff or her appointed representative must demonstrate "that the alleged negligence probably caused, rather than only possibly caused, the plaintiff's injury."  *Bradley v. Miller*, 878 So. 2d 262, 266 (Ala. 2003).  When your experts provide only speculation, and no objective evidence can be found to differentiate amongst a panoply of maybes and could-bes, a plaintiff's action must fall.  And so must this one.

Fittingly, in adopting the Magistrate Judge's Report on this issue, the Court notes that the almost identical issue was persuasively considered by the Supreme Court of Alabama in *Shanes v. Kizer*.  729 So. 2d 319, 320 (Ala. 1999).  There, an estate brought a wrongful death suit under the AMLA after the decedent was found

dead on the couch in her home. *Id.* at 320. The certificate of death listed the cause as an acute myocardial infarction, but no autopsy was performed and therefore no cause of death was medically determined. *Id.* The day before her death, the decedent had visited the emergency room with complaints of cramping and chest pain, and an EKG test came back abnormal. *Id.* The estate claimed the decedent died of a heart attack that could have been prevented had the emergency room doctor properly diagnosed and treated her heart-related problems. *Id.*

Like the instant case, the estate's expert witness opined that the decedent died from a heart attack, not because an autopsy had been performed and had confirmed it, but because of statistical probabilities, the decedent's medical history, and the symptoms the decedent was experiencing the day before she died. *Id.* at 322. The expert, however, also acknowledged the possibility that three other non-heart-related conditions – a stroke, pulmonary embolus or a ruptured aortic aneurysm – could have resulted in the decedent's sudden death. *Id.* Because multiple possibilities could not be absolutely ruled out, the expert conceded that the actual cause of death ultimately was a matter of speculation and conjecture, but that it was his professional opinion the cause of death was a myocardial infarction. *Id.* at 323. The Supreme Court of Alabama, interpreting Alabama law in medical malpractice cases under AMLA, concluded that "the failure medically to determine the actual cause of Moore's death is fatal to this action." *Id.* at 324.

The causation logic, as interpreted under AMLA in *Shanes,* is equally applicable to the instant matter.  Here, like in *Shanes*, Riley was found dead in her home after a recent medical visit, and no autopsy was undertaken so as to medically determine Riley's actual cause of death.  And, here, like in *Shanes*, the estate claims Riley died from a myocardial infarction even though Riley had many comorbidities that could have caused her sudden, unexpected death.

Since (1) there was no autopsy and therefore no actual cause of death determination and (2) the parties' medical experts acknowledge the many possible causes of death (although of varying degrees of possibility), any factfinder ultimately would be forced to, just like in *Shanes*, speculate as to exactly why Riley died.  Under *Daubert*, as under the AMLA, a medical malpractice wrongful death case cannot be premised upon such speculation and conjecture. *See Johnson v. Cracker Barrel Old Country Store, Inc*., Case No. 4:05-CV-1603-RDP, 2007 WL 9711527, at *10 (N.D. Ala. Apr. 2, 2007) (granting summary judgment where the plaintiff's estate failed, among other things, to present evidence of the decedent's actual cause of death); *Nat'l Life & Acc. Ins. Co. v. Allen*, 234 So. 2d 567, 572 (Ala. 1970) ("Verdicts may not be rested upon pure supposition or speculation, and the jury will not be permitted to merely guess as between a number of causes, where there is no satisfactory foundation in the testimony for the conclusion which they have reached."(citing *Colonial Life & Acc Ins. Co. v. Collins*, 194 So. 2d 532, 537 (Ala. 1967)); *cf. Fu v.*

*Wells Fargo Home Mortg.,* Case No. 2:13-CV-01271-AKK, 2014 WL 4681543, at *4, 2014 U.S. Dist. LEXIS 127864 (N.D. Ala. Sept. 12, 2014) (expounding upon causation in a fraud action). As such, the Magistrate Judge's decision to exclude the testimony of the estate's experts on the issue of Riley's cause of death was appropriate, and the Objection is due to be overruled. Therefore, summary judgment must be entered due to the estate's inability to meet its burden of proof on proximate causation.

### B.   Similarly Situated Healthcare Provider

Although the Magistrate Judge recommended summary judgment be entered in favor of the medical defendants as to causation, the medical defendants' Limited Objection nevertheless challenges the Magistrate Judge's conclusion that the estate's two experts were similarly situated healthcare providers to the medical defendants under AMLA. (*See* Doc. 79 at 18-23.) According to the medical defendants, the Magistrate Judge erred because Charash and Gandy, as internists who practice general cardiology, could not testify to the standard of care breached by Mitchell, an interventional cardiologist. (*Id.*) The Court agrees with the medical defendants, and therefore the Limited Objection is sustained.

Usually, a plaintiff under the AMLA must present expert testimony from a similarity-situated healthcare provider to illustrate (1) the appropriate standard of care, (2) a deviation in the instant case from that standard of care, and (3) that the

deviation proximately caused the injury in the case.  *See Breland ex rel. Breland v. Rich*, 69 So. 3d 803, 814 (Ala. 2011).

Pursuant to § 6-5-548(b), a non-specialist[7] "similarly situated healthcare provider" is one who:

(1) Is licensed by the appropriate regulatory board or agency of this or some other state;

(2) Is trained and experienced in the same discipline or school of practice; and

(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.

ALA. CODE (1975) § 6-5-548(b).  A plaintiff must present expert evidence to satisfy each of the above elements, or her case must fail as a matter of law. *E.g.*, *Sherrer v. Embry*, 963 So. 2d 79, 82-83 (Ala. 2007); *Ex parte Waddail*, 827 So. 2d 789, 795-96 (Ala. 2001); *Medlin v. Crosby*, 583 So. 2d 1290, 1292-96 (Ala. 1991).

As the basis of its claims of malpractice, the estate relies on a complicated train of reasoning: that the medical defendants *should* have immediately scheduled and performed a heart catheterization procedure with percutaneous intervention after the November 4, 2014, stress echocardiogram and that, had they done so, the

---

[7] Section 6-5-548(c) does not apply here because Mitchell is not board certified in *interventional* cardiology (Doc. 79 at 28) and is thus not a specialist, as defined under AMLA.  *See Panayiotou v. Johnson*, 995 So. 2d 871, 878 (Ala. 2008) (discussing standard).

catheterization *would* have revealed a blocked artery (somewhere), which *would* have required Mitchell to perform an interventional procedure (such as a balloon angioplasty with stent placement), which *would* have prevented Riley's myocardial infarction (or cardiac dysrhythmia), which *would* have prevented Riley's death. (*See supra* Part II.).

The estate's two experts advance a similar theory; that is, Mitchell breached the standard of care by not urgently scheduling Riley for an interventional procedure following her November 4, 2014, stress test. (Doc. 76-1 at 10-12; Doc. 76-3 at 10-11.) As to Gandy, he goes on to opine that Mitchell and/or his office should have informed Riley of the risks associated with delaying her interventional procedure and that the medical practice failed to ensure that Riley's health issues were addressed during Mitchell's absence. (Doc. 76-3 at 11-12.)

Unlike the Magistrate Judge, the Court concludes that neither Charash nor Gandy are similarly situated to Mitchell and his medical practice under AMLA for three reasons. First, Mitchell holds himself out as an interventional cardiologist and practices interventional cardiology. Second, while some overlap between the clinical practice of a general cardiologist and an interventional cardiologist exists, the medical care at issue in this case specifically and solely concerns interventional cardiology since the estate places fault on Mitchell's alleged failure to expeditiously

21

perform an interventional procedure.[8]   Third, interventional cardiology is a recognized school or discipline of practice distinct from cardiology under AMLA. *See Panayiotou*, 995 So. 2d at 877 (concluding that physician board certified in internal medicine and cardiovascular disease was not similarly situated to a physician who was board certified in internal medicine, cardiovascular disease, *and interventional cardiology*); *see also Interventional Cardiology*, AMERICAN MEDICAL ASSOCIATION, https://www.ama-assn.org/specialty/interventional-cardiology (last visited Mar. 18, 2020).

Charash and Gandy, however, are medical doctors practicing general cardiology with board certifications in internal medicine and cardiovascular disease. (Doc. 76-1 at 1; Doc 76-3 at 1; Doc. 79.)   Neither doctor is board certified in interventional cardiology, and neither doctor practices interventional cardiology. They do not schedule and perform interventional procedures such as the one[9] that they criticize Mitchell for not performing.[10]

---

[8] Although the estate argues that Charash and Gandy are similarly situated because all three doctors are cardiologists and because the estate's allegations against the medical defendants focus largely on clinical cardiology, the estate misconstrues its own complaint's allegations which focus on an interventional procedure that Dr. Mitchell failed to timely perform.  (Doc. 44 at 8-10.)

[9] In addition to not establishing which of Riley's coronary arteries were diseased, the estate also fails to provide any evidence or testimony as to exactly which interventional procedure Mitchell should have performed.

[10] While, as a cardiologist, Gandy does perform catheterizations, (Doc. 88-2 at 4), he does not perform cardiac interventions such as angioplasties and stent placement. (Doc. 79-12 at 13.) Even more removed is Charash, who does not perform catheterizations as a part of his general cardiology practice at all.  (Doc. 79-11 at 4.)

In short, Charash and Gandy are not trained and experienced in the same discipline or school of practice as Dr. Mitchell, and neither has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred. Therefore, neither doctor meets the similarly situated healthcare provider requirement under AMLA.

Finally as to the experts' opinions concerning the actions of Mitchell's medical practice and its medical assistant, although the estate's allegations do involve some degree of clinical practice in cardiology, the clinical setting at issue here is, again, interventional cardiology.[11]  Also, neither of the estate's experts profess to have any expertise as a medical assistant, especially one working in an interventional cardiology medical practice.  As medical doctors, they cannot testify to the standard of care applicable to a medical assistant in an interventional cardiology practice, and cannot "testify down" in this case.  *See, e.g.*, *Husby v. S. Ala. Nursing Home, Inc*., 712 So. 2d 750, 753 (Ala. 1998) (anesthesiologist medical doctor could not testify in a nursing care case); *Colville v. DiValentin,* Case No. CV-05-BE-1979-E, 2009 WL 10687828, at *9 (N.D. Ala. Aug. 14, 2009) (physician not similarly situated health care provider to testify about standard of care for a medical

---

[11] The estate does not contend that Parker was negligent or breached the standard of care.  Instead, the estate claims that Mitchell improperly allowed a medical assistant to reschedule or delay Riley for an interventional procedure.  (Doc. 111 at 6.)

assistant); *Coward v. Volvo Grp. N. Am., Inc.*, No. 2:08-CV-744-WKW, 2009 WL 940381, at *5, 2009 U.S. Dist. LEXIS 28712 (M.D. Ala. Apr. 6, 2009) (board-certified orthopedic hand surgeon not similarly situated to emergency medical technician); *Estate of Bradley v. Mariner Health, Inc*., 315 F. Supp. 2d 1190, 1195-97 (S.D. Ala. 2004) (concluding that medical doctor was not similarly situated healthcare provider to a nurse who provided hands-on nursing care); *cf. Hegarty v. Hudson*, 123 So. 3d 945, 951 (Ala. 2013) (board certified gynecologist not similarly situated to family practice physician).

Because Charash and Gandy (and their practices) are similarly situated to neither Mitchell nor his medical practice, the medical defendants' motion to exclude their standard of care testimony is due to be granted.  Without their opinion testimony, the estate has failed to establish a breach of the standard of care and therefore to meet its burden of proof under AMLA on this prima facie element of its medical malpractice case.  This finding compels summary judgment in their favor. *See Panayiotou*, 995 So. 2d at 880 (ordering summary judgment where the plaintiff estate had failed to present testimony from a similarly situated healthcare provider); *Bradley*, 315 F. Supp. 2d at 1197 (granting summary judgment because the plaintiff estate had failed to present testimony from a similarly situated healthcare provider).

## C.    Other Motions

In its Report, the Magistrate Judge also denied the estate's motions to exclude

or limit the testimony of defense experts Oscar Julian Booker, M.D. (Doc. 83), Alain

Bouchard, M.D. (Doc. 82) and Kevin Sublett, M.D. (Doc. 81).  The Magistrate Judge

also granted in part and denied in part the estate's motion to exclude the testimony

of Arthur Scott Westermeyer, M.D. (Doc. 80) and denied, as moot, the medical

defendants' motion to strike or preclude the use of certain medical literature (Doc.

92).

Since no objections were filed to the Magistrate Judge's rulings on these

motions and since this Court's review reveals no plain error, the Court adopts the

Magistrate Judge's recommendations concerning these motions. *See Sheperd v.*

*Wilson*, 663 F. App'x 813, 816 (11th Cir. 2016) (if no objections to a magistrate

judge's report and recommendation are filed, the district court reviews legal

conclusions only for plain error and only if necessary in the interests of justice).

Accordingly, for the reasons as stated and for good cause, it is

**ORDERED** as follows:

1. The Plaintiff's Motion to Exclude Opinion Testimony of Arthur Scott Westermeyer, M.D. (Doc. 80) is GRANTED in part and DENIED in part, for the reasons set forth in the Report and Recommendation of the Magistrate Judge (Doc. 108);

2. The Plaintiff's Motion to Exclude Testimony and Opinions of Kevin Sublett, M.D. (Doc. 81) is DENIED as moot, for the reasons set forth in the Report and Recommendation of the Magistrate Judge (Doc. 108);

3. The Plaintiff's Motion to Exclude Testimony and Opinions of Alain Bouchard, M.D. (Doc. 82) is DENIED, for the reasons set forth in the Report and Recommendation of the Magistrate Judge (Doc. 108);

4. The Plaintiff's Motion to Exclude Testimony and Opinions of Oscar Julian Booker, M.D. (Doc. 83) is DENIED, for the reasons set forth in the Report and Recommendation of the Magistrate Judge (Doc. 108);

5. The Defendants' Motion to Strike and Preclude Plaintiff's Use of Medical Literature (Doc. 92) is DENIED, for the reasons set forth in the Report and Recommendation of the Magistrate Judge (Doc. 108);

6. The Report and Recommendation of the Magistrate Judge (Doc. 108) is ADOPTED, as modified;

7. The Plaintiff's Objection (Doc. 110) is OVERRULED;

8. The Defendants' Limited Objection (Doc. 109) is SUSTAINED;

9. The Defendants' motion to preclude Plaintiffs' experts and motion for summary judgment (Doc.79) is GRANTED; and

10. This case is DISMISSED with prejudice.

A final judgment will be entered.

DONE, this 5th day of May, 2020.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE